# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>The person of GARY PAUL WALLACE, BOP<br>Register Number: 65845-112 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  2:21-MJ-03973

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1113 | Attempt to Commit Murder or Manslaughter |
| 18 U.S.C. § 1962 | RICO Conspiracy |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Sean Sterle*

*Applicant's signature*

Sean Sterle, FBI Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

*Judge's signature*

City and state:  Los Angeles, CA

*Printed name and title*

AUSA:  Axelrad x7964

## **ATTACHMENT A**

<u>INDIVIDUAL TO BE SEARCHED</u>

The individual to be searched is GARY PAUL WALLACE, BOP Register Number: 65845-112, an African-American male, weighing approximately 165 pounds, approximately 5'7" in height, with black hair and brown eyes, currently in custody at the Metropolitan Detention Center, located at 535 North Alameda Street, Los Angeles, California 90053.

**ATTACHMENT B**

ITEMS TO BE SEIZED

    Samples of GARY PAUL WALLACE's DNA, which is to be obtained through a cotton/buccal swab in the mouth, which may be obtained through the use of reasonable force should GARY PAUL WALLACE refuse to comply with the execution of the search.

## **AFFIDAVIT**

I, Sean Sterle, being duly sworn, declare and state as follows:

### **I. INTRODUCTION**

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for the past 22 years.  From November 1998 through October 2010, I primarily worked as a Gang Investigator in the Los Angeles Division of the FBI.  From October 2010 to February 2012, I primarily worked as a Gang Investigator in the Portland Division of the FBI.  From February 2012 to May 2013, I was a Supervisor in the Undercover and Sensitive Operations Unit at FBI HQ in Washington, D.C. From May 2013 to July 2018, I primarily worked as a Violent Crimes Investigator in the Los Angeles Division of the FBI. From August 2018 to the present, I again worked as a Gang Investigator in the Los Angeles Division of the FBI, primarily as a member of the Gang Homicide Task Force, a partnership between the FBI and the Los Angeles Police Department's South Bureau Homicide Division.

2.    During my time as both a Gang Investigator and a Violent Crime Investigator, I have conducted investigations into crimes such as bank and commercial institution robberies, murders for hire, homicides, cold case homicides, extortions, narcotics trafficking, illegal firearms sales, Bureau of Prisons ("BOP") assaults, interstate threats, and kidnappings.  Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by

gang members and prison inmates to commit criminal acts and violent activities.

## II. **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of an application for a warrant to obtain a DNA sample from:

a.    The person of defendant GARY PAUL WALLACE ("WALLACE"), BOP Register Number: 65845-112, in connection with potential violations of 18 U.S.C. § 1113 (Attempt to Commit Murder or Manslaughter) and 18 U.S.C. § 1962 (RICO Conspiracy) ("SUBJECT OFFENSES"), currently in custody at the Metropolitan Detention Center ("MDC") – Los Angeles, located at 535 North Alameda Street, Los Angeles, California 90053, as further described in Attachment A.[1]

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

---

[1]    On August 10, 2021, law enforcement sought and obtained a search warrant for PAUL GARY WALLACE's DNA.  See 21-MJ-03699.  A copy of the previously issued warrant is attached as Exhibit 1. Because of various schedulling constraints, including with the Bureau of Prisons and when they would provide access to WALLACE, law enforcement was unable to execute the warrant within the time-period permitted by the warrant.

### III. INDIVIDUALS TO BE SEARCHED

5.    The persons to be searched are WALLACE, as further described in Attachment A, which is incorporated herein by reference.

### IV. STATEMENT OF PROBABLE CAUSE

**A.    July 16, 2020 Indictment of WALLACE for RICO Conspiracy and Use of Firearm Resulting in Death**

6.    On July 16, 2020, WALLACE was indicted for his leadership of a RICO conspiracy related to his position as a senior leader of the East Coast Crips and his role in two separate murders in 2003 and 2014, respectively.  See United States v. Wallace, CR No. 20-00293-AB.[2]  Specifically, WALLACE was indicted for Racketeer Influenced and Corrupt Organizations Conspiracy, in violation of 18 U.S.C. § 1962(d), and Use and Carry a Firearm During and in Relation to, and Possess a Firearm in Furtherance of, a Crime of Violence, Resulting in Death, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), (iii), (j)(1).

7.    As set forth in Indictment, WALLACE is charged with his role as the leader of the East Coast Crips.  As the leader of the ECC, and specifically, the "6-Pacc" set of cliques, WALLACE participated in at least two murders in furtherance of the RICO conspiracy: the 2003 murder of R.P. and the 2014 murder of R.B.  Along with these murders, WALLACE engaged in a long-standing pattern of violent criminal conduct in furtherance of the gang, including extortion, drug trafficking, witness intimidation, and weapons possession.

---

[2]  The Indictment in United States v. Wallace is attached as Exhibit 1 and incorporated herein by reference.

8.   On July 23, 2020, WALLACE was arrested on the
Indictment and has been detained pending trial since his arrest.
(Dkt. 12.)

**B.   Background of MDC Stabbing Investigation**

9.   On May 11, 2021, I received an email from BOP
Intelligence Operations Officer Paul Steven Gagliardi stating
that WALLACE had stabbed a fellow MDC inmate earlier that
afternoon.

10.   On May 12, 2021, I interviewed BOP MDC Special
Investigations Support Lieutenant Jason Arredondo.  Based on
this conversations, as well as my familiarity with this
investigation, conversations with other law enforcement agents
and officers, as well as my training and experience, I am aware
of the following:

a.   On May 12, 2021, I spoke via telephone with BOP
MDC Special Investigations Support Lieutenant Jason Arredondo
who informed me that WALLACE had stabbed LEWIS while in LEWIS'
cell.  Specifically, at the time of the assault, LEWIS' cell was
located on the 9th Floor - South in MDC.  Following the assault,
Lieutenant Arredondo explained that WALLACE admitted to MDC
staff that he assaulted LEWIS because LEWIS had "disrespected"
WALLACE.  Lieutenant Arredondo further explained that MDC staff
found the "shiv," prison vernacular for a homemade knife-like
weapon, used by WALLACE to stab LEWIS inside LEWIS' cell
immediately after the assault.

b.   Lieutenant Arredondo reported that LEWIS survived
the stabbing, but was transported to an outside hospital's

emergency room for evaluation due to a puncture wound in LEWIS'
left-chest region.

      c.    Lieutenant Arredondo emailed me photographs of
WALLACE and LEWIS taken by MDC staff immediately after the
assault.  A photograph of LEWIS' upper torso revealed a puncture
wound in his left-chest area with blood running down to his
waistline.

      d.    Lieutenant Arredondo also explained that SIS
personnel reviewed the Closed Circuit Television ("CCTV") video
footage from the 9th Floor - South at the time of the assault
and identified WALLACE as exiting LEWIS' cell <u>after</u> LEWIS
staggered out of his cell.

    **C.**    **Subsequent Investigation of the Attempted Murder**

    11.  On May 25, 2021, Los Angeles Police Department
("LAPD") Detective and Federal Task Force Officer ("TFO") Melvin
Hernandez and I interviewed MDC SIS Tech Abel Delgado.  Based on
this conversation, as well as my familiarity with this
investigation, conversations with other law enforcement agents
and officers, as well as my training and experience, I am aware
of the following:

      a.    On the afternoon of May 11, 2021, Tech Delgado
responded to a call for assistance on the 9th Floor - South at
MDC.  Tech Delgado stated that when he arrived at 9th Floor -
South, a CO informed him that WALLACE had been in an altercation
with another inmate and that WALLACE was in his cell – cell
number 937.

b.   Tech Delgado explained that he then went to WALLACE's cell where he asked WALLACE to explain what had occurred.  According to Tech Delgado, WALLACE stated that he had been in a "fight" with LEWIS "over a minor disrespect issue." WALLACE went on to state that the fight between him and LEWIS occurred because LEWIS was not following "prison politics."

c.   Tech Delgado explained that WALLACE was the "Rep" or leader of all the Black inmates on the 9th Floor - South and, if LEWIS was not following the "program" or rules set by the "Rep" (WALLACE), it could cause problems for all the Black inmates on the 9th Floor - South due to "prison politics."

d.   Once WALLACE had confessed to Tech Delgado about being involved in an altercation with LEWIS, Tech Delgado transported WALLCE to MDC's Secure Housing Unit.

e.   After being told by other MDC staff members that LEWIS had been stabbed in the chest, Tech Delgado returned to the 9th Floor - South and conducted a search of LEWIS' cell. Inside LEWIS' cell, Tech Delgado observed a "homemade weapon or shank" on the floor near the bottom bunk bed in "the common area of the cell."

f.   On May 25, 2021, I showed Tech Delgado a BOP photograph taken in LEWIS' cell on May 11, 2021 of a shank, a homemade weapon.  Tech Delgado immediately recognized the approximate 4-inch shank as the weapon he had observed on the floor of LEWIS' cell.  The shank appears to be made out of metal with a sharp point and a cloth handle.

g.    Tech Delgado reported that he found part of a
torn light-green prison shirt in LEWIS' cell and that the other
part of the torn light-green prison shirt, which had stains that
appeared to be blood, was found in a trash can outside of LEWIS'
cell.  Tech Delgado also advised that he spoke to a Black inmate
after the stabbing and the inmate told him that there had been a
meeting earlier that day of all the Black inmates on the 9th
Floor - South.   During that meeting, all the Black inmates
discussed how they had to follow the "program" or rules set for
the floor, but LEWIS told everyone that he would not follow the
set "program."  Tech Delgado advised that he could not remember
the name of the Black inmate who told him about the meeting.

12.  On May 19, 2021, TFO Hernandez and I interviewed MDC
SIS Tech Guillermina Mencos.  Based on this conversation, as
well as my familiarity with this investigation, conversations
with other law enforcement agents and officers, as well as my
training and experience, I am aware of the following:

a.    On the afternoon of May 11, 2021, Tech Mencos
responded to a call for assistance on the 9th Floor - South in
MDC.  Tech Mencos advised that when she arrived on the 9th Floor
- South, she saw CO Andrew Flores standing with LEWIS.  CO
Flores informed Tech Mencos that LEWIS had sustained a wound to
his chest.

b.    Tech Mencos inspected the puncture wound to the
left side of LEWIS' chest and observed that he could not stand
up straight due to the pain in his left chest region.  LEWIS
complained that he was having difficulty breathing.  Tech Mencos

asked LEWIS where the assault had taken place and LEWIS answered, "In my cell."  When Tech Mencos asked LEWIS who stabbed him, LEWIS refused to answer and said something to the effect of, "It was a misunderstanding."

        c.   Tech Mencos reviewed the 9th Floor - South CCTV video that captured the time of the assault and recognized both WALLACE and LEWIS but noted there may have been a third unidentified inmate involved in the altercation.  Specifically, Tech Mencos reported that on the video she could see WALLACE and an unidentified inmate go into LEWIS' cell.  A short time later LEWIS can be seen struggling to leave his cell, followed by the unidentified inmate and WALLACE.

        d.   Tech Mencos advised that WALLACE was the "shot caller" (leader) of the Black inmates on the 9th Floor - South.

**D.   Post-Assault Interview of Victim-Inmate LEWIS**

13.  On May 19, 2021, TFO Hernandez and I interviewed LEWIS.  Based on this interview, my familiarity with this investigation, and my training and experience, I am aware of the following:

        a.   LEWIS stated that on May 11, 2021, he was in his cell when he was hit in the head and "blacked out," and that someone stabbed him.  LEWIS stated that he did not know who hit him in the head or who stabbed him.  LEWIS further stated that he did not have a weapon in his cell and if a weapon was found in his cell – it was not his weapon.  LEWIS explained that he did not want to cooperate with law enforcement and refused to say anything more about the stabbing incident.

b.   Based on my training and experience investigating a number of inmate assaults at MDC, victim inmates are often reluctant to cooperate with law enforcement out of a fear of retaliation by fellow inmates.

**E.   Potential for DNA Analysis**

14.   On June 21, 2021, I communicated with Tiffany Smith at the FBI Laboratory, Casework Unit, Quantico, Virginia.  Based on this interview, my familiarity with this investigation, and my training and experience, I am aware of the following:

a.   Smith stated that the FBI Laboratory could test for DNA on the "shiv," but the Laboratory would also need a known reference DNA sample from both WALLACE and Lewis because the DNA database does not allow the FBI Laboratory retrieve DNA profiles.  As a result, comparative DNA samples from the suspect and victim are necessary.

15.   While DNA swabs were taken of LEWIS and WALLACE at the time of their bookings into both state and federal custody, a DNA swab for the dedicated purpose of comparison is necessary for the DNA analysis of the "shiv."  The DNA swabs obtained during intake at the custody facilities are only used for input into CODIS – a national DNA database.

**F.   Probable Cause that Search of WALLACE and LEWIS will Leave to Evidence of SUBJECT OFFENSES**

16.   Based on my training and experience, I know that DNA of those who handle knife-like weapons may be found on the various surfaces of the weapon, to include the handle and blade of the weapon.  I also know that the DNA of those who receive

stab wounds from knife-like weapons may be found on the various surfaces of the weapon.

17.   Accordingly, I submit there is probable cause to believe that comparing DNA samples obtained from WALLACE and LEWIS to the DNA samples obtained from the "shiv" may lead to evidence of WALLACE's involvement in the SUBJECT OFFENSES.

### V.  ITEMS TO BE SEIZED

18.   The items to be seized, including certain protocol for doing so, are set forth in Attachment B, which is incorporated herein by reference.

### VI. CONCLUSION

19.   For all the reasons described above, there is probable cause to believe that evidence of violations of the SUBJECT OFFENSES, as described above and in Attachment B, will be found in obtaining a DNA sample from WALLACE, as further described above and in Attachments A.


_____
SEAN STERLE, Special Agent, FBI


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __ day of
August, 2021.


_____
UNITED STATES MAGISTRATE JUDGE

10

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>The person of GARY PAUL WALLACE, BOP<br>Register Number: 65845-112 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  2:21-MJ-03699

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1113 | Attempt to Commit Murder or Manslaughter |
| 18 U.S.C. § 1962 | RICO Conspiracy |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Sean Sterle*

*Applicant's signature*

Sean Sterle, FBI Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

Date:  August 10, 2021

*Judge's signature*

City and state:  Los Angeles, CA

The Hon. Gail J. Standish

*Printed name and title*

AUSA:  Axelrad x7964

## <u>ATTACHMENT A-1</u>

<u>INDIVIDUAL TO BE SEARCHED</u>

The individual to be searched is GARY PAUL WALLACE, BOP Register Number: 65845-112, an African-American male, weighing approximately 165 pounds, approximately 5'7" in height, with black hair and brown eyes, currently in custody at the Metropolitan Detention Center, located at 535 North Alameda Street, Los Angeles, California 90053.

**ATTACHMENT B**

ITEMS TO BE SEIZED

Samples of GARY PAUL WALLACE's DNA, which is to be obtained through a cotton/buccal swab in the mouth, which may be obtained through the use of reasonable force should GARY PAUL WALLACE refuse to comply with the execution of the search.

Samples of DASHAWN LEWIS' DNA, which is to be obtained through a cotton/buccal swab in the mouth, which may be obtained through the use of reasonable force should DASHAWN LEWIS refuse to comply with the execution of the search.

<u>**AFFIDAVIT**</u>

I, Sean Sterle, being duly sworn, declare and state as follows:

## I.  <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for the past 22 years.  From November 1998 through October 2010, I primarily worked as a Gang Investigator in the Los Angeles Division of the FBI.  From October 2010 to February 2012, I primarily worked as a Gang Investigator in the Portland Division of the FBI.  From February 2012 to May 2013, I was a Supervisor in the Undercover and Sensitive Operations Unit at FBI HQ in Washington, D.C. From May 2013 to July 2018, I primarily worked as a Violent Crimes Investigator in the Los Angeles Division of the FBI. From August 2018 to the present, I again worked as a Gang Investigator in the Los Angeles Division of the FBI, primarily as a member of the Gang Homicide Task Force, a partnership between the FBI and the Los Angeles Police Department's South Bureau Homicide Division.

2.   During my time as both a Gang Investigator and a Violent Crime Investigator, I have conducted investigations into crimes such as bank and commercial institution robberies, murders for hire, homicides, cold case homicides, extortions, narcotics trafficking, illegal firearms sales, Bureau of Prisons ("BOP") assaults, interstate threats, and kidnappings.  Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by

gang members and prison inmates to commit criminal acts and violent activities.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of an application for a warrant to obtain a DNA sample from:

a.    The person of defendant GARY PAUL WALLACE ("WALLACE"), BOP Register Number: 65845-112, in connection with potential violations of 18 U.S.C. § 1113 (Attempt to Commit Murder or Manslaughter) and 18 U.S.C. § 1962 (RICO Conspiracy) ("SUBJECT OFFENSES"), currently in custody at the Metropolitan Detention Center ("MDC") – Los Angeles, located at 535 North Alameda Street, Los Angeles, California 90053, as further described in Attachment A-1.

b.    The person of defendant DASHAWN LEWIS ("LEWIS"), BOP Register Number: 20954-509, in connection with potential violations of the SUBJECT OFFENSES, currently in the custody of the United States Marshall's Service, as further described in Attachment A-2.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>INDIVIDUALS TO BE SEARCHED</u>

5.     The persons to be searched are WALLACE and LEWIS, as further described in Attachments A-1 and A-2, which are incorporated herein by reference.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.     July 16, 2020 Indictment of WALLACE for RICO Conspiracy and Use of Firearm Resulting in Death**

6.     On July 16, 2020, WALLACE was indicted for his leadership of a RICO conspiracy related to his position as a senior leader of the East Coast Crips and his role in two separate murders in 2003 and 2014, respectively.  <u>See</u> <u>United States v. Wallace</u>, CR No. 20-00293-AB.[1]  Specifically, WALLACE was indicted for Racketeer Influenced and Corrupt Organizations Conspiracy, in violation of <u>18 U.S.C. § 1962(d)</u>, and Use and Carry a Firearm During and in Relation to, and Possess a Firearm in Furtherance of, a Crime of Violence, Resulting in Death, in violation of <u>18 U.S.C. §§ 924(c)(1)(A)(ii)</u>, <u>(iii)</u>, <u>(j)(1)</u>.

7.     As set forth in Indictment, WALLACE is charged with his role as the leader of the East Coast Crips.  As the leader of the ECC, and specifically, the "6-Pacc" set of cliques, WALLACE participated in at least two murders in furtherance of the RICO conspiracy: the 2003 murder of R.P. and the 2014 murder of R.B.  Along with these murders, WALLACE engaged in a long-standing pattern of violent criminal conduct in furtherance of the gang, including extortion, drug trafficking, witness intimidation, and weapons possession.

---

[1]  The Indictment in <u>United States v. Wallace</u> is attached as Exhibit 1 and incorporated herein by reference.

8.   On July 23, 2020, WALLACE was arrested on the Indictment and has been detained pending trial since his arrest. (Dkt. 12.)

**B.   Background of MDC Stabbing Investigation**

9.   On May 11, 2021, I received an email from BOP Intelligence Operations Officer Paul Steven Gagliardi stating that WALLACE had stabbed a fellow MDC inmate earlier that afternoon.

10.   On May 12, 2021, I interviewed BOP MDC Special Investigations Support Lieutenant Jason Arredondo.  Based on this conversations, as well as my familiarity with this investigation, conversations with other law enforcement agents and officers, as well as my training and experience, I am aware of the following:

a.   On May 12, 2021, I spoke via telephone with BOP MDC Special Investigations Support Lieutenant Jason Arredondo who informed me that WALLACE had stabbed LEWIS while in LEWIS' cell.  Specifically, at the time of the assault, LEWIS' cell was located on the 9th Floor - South in MDC.  Following the assault, Lieutenant Arredondo explained that WALLACE admitted to MDC staff that he assaulted LEWIS because LEWIS had "disrespected" WALLACE.  Lieutenant Arredondo further explained that MDC staff found the "shiv," prison vernacular for a homemade knife-like weapon, used by WALLACE to stab LEWIS inside LEWIS' cell immediately after the assault.

b.   Lieutenant Arredondo reported that LEWIS survived the stabbing, but was transported to an outside hospital's

4

emergency room for evaluation due to a puncture wound in LEWIS'
left-chest region.

       c.   Lieutenant Arredondo emailed me photographs of
WALLACE and LEWIS taken by MDC staff immediately after the
assault. A photograph of LEWIS' upper torso revealed a puncture
wound in his left-chest area with blood running down to his
waistline.

       d.   Lieutenant Arredondo also explained that SIS
personnel reviewed the Closed Circuit Television ("CCTV") video
footage from the 9th Floor - South at the time of the assault
and identified WALLACE as exiting LEWIS' cell <u>after</u> LEWIS
staggered out of his cell.

     **C.**    **Subsequent Investigation of the Attempted Murder**

     11.   On May 25, 2021, Los Angeles Police Department
("LAPD") Detective and Federal Task Force Officer ("TFO") Melvin
Hernandez and I interviewed MDC SIS Tech Abel Delgado. Based on
this conversation, as well as my familiarity with this
investigation, conversations with other law enforcement agents
and officers, as well as my training and experience, I am aware
of the following:

       a.   On the afternoon of May 11, 2021, Tech Delgado
responded to a call for assistance on the 9th Floor - South at
MDC. Tech Delgado stated that when he arrived at 9th Floor -
South, a CO informed him that WALLACE had been in an altercation
with another inmate and that WALLACE was in his cell – cell
number 937.

b.   Tech Delgado explained that he then went to WALLACE's cell where he asked WALLACE to explain what had occurred.  According to Tech Delgado, WALLACE stated that he had been in a "fight" with LEWIS "over a minor disrespect issue." WALLACE went on to state that the fight between him and LEWIS occurred because LEWIS was not following "prison politics."

c.   Tech Delgado explained that WALLACE was the "Rep" or leader of all the Black inmates on the 9th Floor - South and, if LEWIS was not following the "program" or rules set by the "Rep" (WALLACE), it could cause problems for all the Black inmates on the 9th Floor - South due to "prison politics."

d.   Once WALLACE had confessed to Tech Delgado about being involved in an altercation with LEWIS, Tech Delgado transported WALLCE to MDC's Secure Housing Unit.

e.   After being told by other MDC staff members that LEWIS had been stabbed in the chest, Tech Delgado returned to the 9th Floor - South and conducted a search of LEWIS' cell. Inside LEWIS' cell, Tech Delgado observed a "homemade weapon or shank" on the floor near the bottom bunk bed in "the common area of the cell."

f.   On May 25, 2021, I showed Tech Delgado a BOP photograph taken in LEWIS' cell on May 11, 2021 of a shank, a homemade weapon.  Tech Delgado immediately recognized the approximate 4-inch shank as the weapon he had observed on the floor of LEWIS' cell.  The shank appears to be made out of metal with a sharp point and a cloth handle.

g.   Tech Delgado reported that he found part of a torn light-green prison shirt in LEWIS' cell and that the other part of the torn light-green prison shirt, which had stains that appeared to be blood, was found in a trash can outside of LEWIS' cell.  Tech Delgado also advised that he spoke to a Black inmate after the stabbing and the inmate told him that there had been a meeting earlier that day of all the Black inmates on the 9th Floor - South.   During that meeting, all the Black inmates discussed how they had to follow the "program" or rules set for the floor, but LEWIS told everyone that he would not follow the set "program."  Tech Delgado advised that he could not remember the name of the Black inmate who told him about the meeting.

12.  On May 19, 2021, TFO Hernandez and I interviewed MDC SIS Tech Guillermina Mencos.  Based on this conversation, as well as my familiarity with this investigation, conversations with other law enforcement agents and officers, as well as my training and experience, I am aware of the following:

a.   On the afternoon of May 11, 2021, Tech Mencos responded to a call for assistance on the 9th Floor - South in MDC.  Tech Mencos advised that when she arrived on the 9th Floor - South, she saw CO Andrew Flores standing with LEWIS.  CO Flores informed Tech Mencos that LEWIS had sustained a wound to his chest.

b.   Tech Mencos inspected the puncture wound to the left side of LEWIS' chest and observed that he could not stand up straight due to the pain in his left chest region.  LEWIS complained that he was having difficulty breathing.  Tech Mencos

asked LEWIS where the assault had taken place and LEWIS answered, "In my cell."  When Tech Mencos asked LEWIS who stabbed him, LEWIS refused to answer and said something to the effect of, "It was a misunderstanding."

      c.  Tech Mencos reviewed the 9th Floor - South CCTV video that captured the time of the assault and recognized both WALLACE and LEWIS but noted there may have been a third unidentified inmate involved in the altercation.  Specifically, Tech Mencos reported that on the video she could see WALLACE and an unidentified inmate go into LEWIS' cell.  A short time later LEWIS can be seen struggling to leave his cell, followed by the unidentified inmate and WALLACE.

      d.  Tech Mencos advised that WALLACE was the "shot caller" (leader) of the Black inmates on the 9th Floor - South.

**D.  Post-Assault Interview of Victim-Inmate LEWIS**

13.  On May 19, 2021, TFO Hernandez and I interviewed LEWIS.  Based on this interview, my familiarity with this investigation, and my training and experience, I am aware of the following:

      a.  LEWIS stated that on May 11, 2021, he was in his cell when he was hit in the head and "blacked out," and that someone stabbed him.  LEWIS stated that he did not know who hit him in the head or who stabbed him.  LEWIS further stated that he did not have a weapon in his cell and if a weapon was found in his cell – it was not his weapon.  LEWIS explained that he did not want to cooperate with law enforcement and refused to say anything more about the stabbing incident.

b.   Based on my training and experience investigating a number of inmate assaults at MDC, victim inmates are often reluctant to cooperate with law enforcement out of a fear of retaliation by fellow inmates.

**E.   Potential for DNA Analysis**

14.   On June 21, 2021, I communicated with Tiffany Smith at the FBI Laboratory, Casework Unit, Quantico, Virginia.  Based on this interview, my familiarity with this investigation, and my training and experience, I am aware of the following:

a.   Smith stated that the FBI Laboratory could test for DNA on the "shiv," but the Laboratory would also need a known reference DNA sample from both WALLACE and Lewis because the DNA database does not allow the FBI Laboratory retrieve DNA profiles.  As a result, comparative DNA samples from the suspect and victim are necessary.

15.   While DNA swabs were taken of LEWIS and WALLACE at the time of their bookings into both state and federal custody, a DNA swab for the dedicated purpose of comparison is necessary for the DNA analysis of the "shiv."  The DNA swabs obtained during intake at the custody facilities are only used for input into CODIS – a national DNA database.

**F.   Probable Cause that Search of WALLACE and LEWIS will Leave to Evidence of SUBJECT OFFENSES**

16.   Based on my training and experience, I know that DNA of those who handle knife-like weapons may be found on the various surfaces of the weapon, to include the handle and blade of the weapon.  I also know that the DNA of those who receive

stab wounds from knife-like weapons may be found on the various surfaces of the weapon.

17.  Accordingly, I submit there is probable cause to believe that comparing DNA samples obtained from WALLACE and LEWIS to the DNA samples obtained from the "shiv" may lead to evidence of WALLACE's involvement in the SUBJECT OFFENSES.

### V.  ITEMS TO BE SEIZED

18.  The items to be seized, including certain protocol for doing so, are set forth in Attachment B, which is incorporated herein by reference.

//

//

### VI. CONCLUSION

19.  For all the reasons described above, there is probable cause to believe that evidence of violations of the SUBJECT

OFFENSES, as described above and in Attachment B, will be found

in obtaining DNA samples from WALLACE and LEWIS, as further

described above and in Attachments A-1 and A-2.


/S/
_____
SEAN STERLE, Special Agent,
FBI

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __ day of ~~July,~~
~~2021.~~  August 10, 2021

_____
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 2:20-cr-00293-PA |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. §§ 924(c)(1)(A)(ii), (iii), (j)(1): Use and Carry a Firearm During and in Relation to, and Possess a Firearm in Furtherance of, a Crime of Violence, Resulting in Death] |
| PAUL GARY WALLACE, aka "Doc," "Lil Doc," "Lil Doc Thone," "Bill," "Uncle Bill," and "Still Bill," | |
| Defendant. | |

The Grand Jury charges:

GENERAL ALLEGATIONS

At times relevant to this Indictment:

A. THE ENTERPRISE

1.    Defendant PAUL GARY WALLACE, also known as "Doc," "Lil Doc," "Lil Doc Thone," "Bill," "Uncle Bill," and "Still Bill," and others known and unknown to the Grand Jury, were members and associates of an organization engaged in, among other things, trafficking and conspiracy to traffic in narcotics and controlled

substances, and acts involving murder, robbery, extortion, and witness intimidation. This organization, known as the "East Coast Crips" ("ECC"), operated in the Central District of California and elsewhere. The ECC, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The ECC engaged in, and its activities affected, interstate and foreign commerce. The East Coast Crips constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

B.    BACKGROUND OF THE RACKETEERING ENTERPRISE

2.    The ECC gang was a violent street gang that claimed a large portion of South Los Angeles, from approximately 1st Street to 190th Street, between the 110 Freeway and Central Avenue. The ECC gang existed since the late 1970s and was composed of smaller groups known as "sets." Thirteen primary sets of the ECC (1, 59, 62, 66, 68, 69, 76, 89, 97, Q102, 118, 190, 1200), with a total combined membership of more than approximately 850 members, operated in and around the Los Angeles area. The "sets" operated under the umbrella rules of the ECC.

3.    The ECC gang's sets controlled territories throughout the city and tended to operate within those areas on a day-to-day basis. All of those entities, however, claimed membership in, and respected the overarching and encompassing parent gang of, the ECC. Often each set of the ECC would sell drugs and conduct robberies and other crimes with members of their respective sets in and around their turf, but would also intermingle with other members from the various

ECC sets. The 62, 66, 68, and 69 sets of ECC were collectively referred to as the "6 Pacc."

4. The ECC gang most commonly aligned with the Rollin' Crips sets, Neighborhood Crips sets, and some motorcycle clubs, such as the Deuces and Sin City Disciples. The ECC associated with several smaller gangs such as the 71 and 74 Hustlers, Drugs N Alcohol, and multiple Gangster Crips sets.

5. The ECC gang had long-standing rivalries with certain other gangs. In particular, the ECC most commonly fought with Hoover Criminals and Hoover Crips sets, Main Street Crips, Broadway Gangster Crips, Mad Swan Bloods, Pueblo Bishop Bloods, Avalon Park Bloods, and Florencia 13.

6. The ECC gang regularly engaged in a variety of violent crimes including assaults, robberies, home invasion burglaries, bank robberies, firearms violations, narcotics distribution and sales, witness intimidation, extortion, and murder. Members of the gang also engaged in vandalism, prostitution, vehicle theft, and identity theft. The sales of illegal narcotics (most commonly powder cocaine, crack cocaine, and marijuana), as well as robberies and home invasion burglaries (known as "floccing"), provided the primary source of illicit income for the ECC gang and its members.

7. ECC members frequently "tagged" graffiti to mark their territory. ECC members commonly got tattoos of symbols of the ECC gang including the letters "E" and "C" or "EC" or "ECC" to represent "East Coast Crips," "N" and "H" to represent "Neighborhood Crips," "ES" to represent "East Side," the corresponding numbers of the ECC set in which they claimed membership (such as 62, 69, 97, 118, etc.), "BK" to represent "Bloods Killer" and "FK" or "Flower Killer" to

3

represent "Florencia 13 Killer," depictions of devils and skulls, depictions of the 110 Freeway sign, and depictions of stacks of money, money bags, and dollar symbols.

8.   The ECC gang was loosely structured with a range of ranks/roles, including "OGs" (Original Gangsters) and "Big Homies," as well as "YGs" (Young Gangsters).  "OGs" and "Big Homies" had respect and authority in the gang, provided leadership, direction, and guidance to the younger members, could order gang meetings, shootings, and internal discipline, and often provided the supply, connections, and locations to sell and stash narcotics and firearms for the gang, such as small businesses and houses or apartment units. "YGs" generally carried out the day-to-day operations of the gang by way of intimidation, armed protection of their neighborhood and drug territory from rivals, conducting robberies, burglaries, and fraud schemes, retaliatory shootings, transportation and sales of narcotics and firearms, and the operation of gang hangout and stash locations. The ECC "YGs" were also referred to as "Foot Soldiers," "Thugs," "Shooters/Gunners," "Dope Boys" and "Floccers."

9.   ECC maintained a presence within jails and prisons within California.  Within the jails and prisons in California, ECC members banded together to carry out acts of violence against individuals who were believed to be cooperating with law enforcement, to protect against rivals gangs, and to control the distribution of narcotics within the jails and prisons.  To accomplish these goals, ECC members frequently maintained weapons within the jails for the purposes of protection and for use in assaults against individuals believed to be cooperating.

C.   <u>PURPOSES OF THE ENTERPRISE</u>

10.   The purposes of the ECC enterprise included, but were not limited to, the following:

a.   Enriching members and associates of the ECC through the control of and participation in the distribution of narcotics within ECC territory, extortion, as well as through engaging in armed robberies of local citizens, businesses, and banks;

b.   Preserving, promoting, and protecting the power, territory, and profits of the ECC and its members and associates;

c.   Exposing and punishing ECC members and associates who were perceived to have violated ECC codes of conduct;

d.   Maintaining ECC control and authority over its territory, often through threats, intimidation and acts of violence committed against local residents and rival gangs; and

e.   Violently retaliating against rival gang members or perceived outsiders who challenged ECC authority.

D.   <u>THE MEANS AND METHODS OF THE ENTERPRISE</u>

11.   The means and methods by which members and associates conducted and participated in the conduct of the affairs of the ECC included the following:

a.   Members and associates of the ECC gang committed, and conspired, attempted, and threatened to commit acts of violence to protect and expand the enterprise's criminal operation, including assaults, murders, acts of intimidation, and threats of violence directed against rival gang members and witnesses in criminal cases, and to violently discipline insubordinate members of the enterprise.

5

b.     Members and associates of the ECC gang maintained firearms and ammunition for use in gang-related violence and for protection against rivals.

c.     Members and associates of the ECC gang promoted a climate of fear, through acts of violence and threats to commit acts of violence.

d.     Members and associates of the ECC gang engaged in drug trafficking, gun trafficking, and extortion as a means to generate income.

e.     Members and associates of the ECC gang frequently engaged in the aforementioned criminal activity in the presence of other ECC gang members and/or associates in order to enhance the gang status of those directly conducting the criminal acts.  Members and associates of the ECC gang would provide instructions to the junior members committing crimes in their presence, would ensure the criminal acts were completed, and would provide verification to other ECC gang members that the crimes occurred.

COUNT ONE

[18 U.S.C. § 1962(d)]

Paragraphs 1 through 11 of the General Allegations are re-alleged and incorporated here.

A.   THE RACKETEERING CONSPIRACY

1.    Beginning on a date unknown, and continuing to on or about July 16, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant PAUL GARY WALLACE, also known as "Doc," "Lil Doc," "Lil Doc Thone," "Bill," "Uncle Bill," and "Still Bill," and others known and unknown to the Grand Jury, being persons employed by and associated with the ECC, an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of:

a.    Multiple acts involving murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 188, 189, and 664;

b.    Multiple acts involving extortion, in violation of California Penal Code Sections 21a, 31, 182, 518, 519 and 664;

c.    Multiple offenses involving drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and

d.    Multiple acts indictable under Title 18, United States Code, Section 1512, relating to tampering with a witness, victim, or informant.

7

2.    It was a further part of the conspiracy that defendant WALLACE agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished in substance as follows:

1.    Defendant WALLACE, who as of July 16, 2020, had been a senior leader of the ECC for approximately 30 years, and who, during relevant times, was the most influential member of the 6 Pacc of the ECC, would commit murder and conspire and attempt to commit murder in order to enhance the violent reputation of the ECC gang, to enhance his status within the gang, to retaliate against rival gang members, and to enforce discipline within the gang.

2.    Defendant WALLACE would protect the gang's territory from rivals by carrying firearms and using violence, such as robberies, acts of intimidation, assaults, and shootings against the gang's rivals.

3.    Defendant WALLACE would sell drugs within the ECC gang's territory.

4.    Defendant WALLACE would maintain firearms and ammunition for his own use and to provide to other ECC members.

5.    Defendant WALLACE would obtain weapons within the jails for use against rivals.

6.    Defendant WALLACE would identify individuals who were cooperating against law enforcement and sanction violence against them.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the object and purposes of the conspiracy, on or about the following dates, defendant WALLACE, and other members and associates of the ECC, committed and caused to be committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:   In the late 1970s, defendant WALLACE was initiated into the 69th Street set of the ECC with the gang moniker "Lil Doc Thone."

Overt Act No. 2:   On or about February 12, 1989, within ECC territory, defendant WALLACE possessed cocaine for sale.

Overt Act No. 3:   On or about October 21, 1996, while in the custody of the California Department of Corrections, defendant WALLACE possessed a weapon, namely, an approximately 6-inch long dagger fashioned out of a piece of a table saw.

Overt Act No. 4:   On or about March 17, 2000, within ECC territory, defendant WALLACE carried a loaded firearm.

Overt Act No. 5:   On or about February 9, 2003, within ECC territory, defendant WALLACE using a handgun, shot and murdered R.P., an ECC gang member who publicly disrespected defendant WALLACE.

Overt Act No. 6:   On or about July 26, 2006, within rival gang territory, defendant WALLACE possessed a loaded semi-automatic .380 caliber pistol.

Overt Act No. 7:   On or about January 23, 2009, within ECC territory, defendant WALLACE possessed six rounds of .38 caliber ammunition that he intended to provide to another ECC gang member.

Overt Act No. 8:    On or about September 25, 2011, within ECC territory, defendant WALLACE possessed .22 grams of cocaine.

Overt Act No. 9:    On or about November 13, 2014, defendant WALLACE drove a co-conspirator to R.B.'s residence in a white Cadillac Escalade, within rival gang territory, and provided the co-conspirator with a 7.62 caliber Norinco AKM-47S assault rifle, which the co-conspirator used to murder R.B.

Overt Act No. 10:    On or about November 13, 2014, defendant WALLACE told a cooperating witness, "We just knocked the fool Red down," in reference to the murder of R.B.

Overt Act No. 11:    On or about July 24, 2015, within a vehicle defendant WALLACE had rented, located near defendant WALLACE's residence, within ECC territory, defendant WALLACE possessed the 7.62 caliber Norinco AKM-47S assault rifle, which was loaded with 13 rounds of assorted ammunition and had been used to murder R.B.

Overt Act No. 12:    On or about February 5, 2016, at defendant WALLACE's residence, within ECC territory, defendant WALLACE possessed a CZ model 75 BD Police 9 mm caliber pistol, bearing serial number BF876; a Beretta unknown model 7.65 mm caliber pistol, bearing serial number 561440; seven rounds of 9 mm Luger caliber ammunition; 15 rounds of .38 caliber ammunition; approximately 621 gross grams of marijuana; and several pills of ecstasy, including pills that defendant WALLACE had attempted to flush down the toilet.

Overt Act No. 13:    On or about February 9, 2016, from a telephone within the Metropolitan Detention Center in Los Angeles, California, using coded language, defendant WALLACE discussed the extortion of a marijuana dispensary within ECC territory and the payment to defendant WALLACE of a portion of those proceeds.

Overt Act No. 14:   On or about February 10, 2016, from a telephone within the Metropolitan Detention Center, using coded language, defendant WALLACE told a co-conspirator that another ECC member would be "taking over everything" for defendant WALLACE while defendant WALLACE was in custody.

Overt Act No. 15:   On or about February 11, 2016, from a telephone within the Metropolitan Detention Center, using coded language, defendant WALLACE told a co-conspirator the identity of an ECC member who was cooperating with law enforcement.

Overt Act No. 16:   On or about February 12, 2016, from a telephone within the Metropolitan Detention Center, using coded language, defendant WALLACE discussed the extortion of a marijuana dispensary within ECC territory and the payment to defendant WALLACE of a portion of those proceeds.

Overt Act No. 17:   On or about February 14, 2016, from a telephone within the Metropolitan Detention Center, using coded language, defendant WALLACE discussed with the owner of a marijuana dispensary in ECC territory the payment of proceeds to defendant WALLACE and the ECC member who would handle the collection while defendant WALLACE remained in custody.

Overt Act No. 18:   On or about February 14, 2016, from a telephone within the Metropolitan Detention Center, using coded language, defendant WALLACE discussed with co-conspirators the extortion of a marijuana dispensary within ECC territory.

Overt Act No. 19:   On or about March 17, 2016, from a telephone within the Metropolitan Detention Center, using coded language, defendant WALLACE told a co-conspirator that the assault rifle which defendant WALLACE possessed in a rented vehicle was used in a murder.

11

Overt Act No. 20: On or about April 26, 2016, from a telephone within the Metropolitan Detention Center, using coded language, defendant WALLACE told a co-conspirator that the assault rifle which defendant WALLACE possessed in a rented vehicle was used in a murder.

Overt Act No. 21: On or about December 15, 2016, from a telephone within the Metropolitan Detention Center, using coded language, defendant WALLACE told a co-conspirator, "Cuz, I'm so hot man, Cuz . . . I was out there from 1st St. to 109, those niggas man, out of the way of me, Cuz," a reference to defendant WALLACE's position of power and influence within the ECC and over 10 ECC sets, including the 6 Pacc.

Overt Act No. 22: On or about December 28, 2016, from a telephone within the Metropolitan Detention Center, using coded language, defendant WALLACE told a co-conspirator that "Any nigga get at me like that up in here or out there, nigga. I'm gonna burn with a knife up in here and I'm gonna burn him with bullets out there . . . That's the real."

Overt Act No. 23: On or about March 25, 2018, within the Metropolitan Detention Center, defendant WALLACE and a co-conspirator, who was a more junior member of ECC, possessed a homemade knife that had been sharpened.

Overt Act No. 24: On or before April 18, 2018, within the Metropolitan Detention Center, a co-conspirator stole "protective order" documents to prove to defendant WALLACE that a senior member of ECC was cooperating with law enforcement against the co-conspirator, so that defendant WALLACE would approve of an assault against the senior member of the ECC.

Overt Act No. 25:   On or about April 18, 2018, within the Metropolitan Detention Center, defendant WALLACE discussed with the co-conspirator the plan for an assault against the senior member of ECC who was cooperating with law enforcement against the co-conspirator.

Overt Act No. 26:   In or about November 2019, in an interview about ECC, defendant WALLACE stated "I'm killing, I'm going to hell, He said you [U/I] shall not kill, I done kill . . . I done kill few motherfuckers, so I know I'm going to hell," and, in referring to a rival gang member, said "he was killing like a motherfucker like me . . . and I'm like damn, they putting in work, they got murders under their belt like a motherfucker, I got murders under my."

D.   NOTICE OF SPECIAL SENTENCING ALLEGATIONS

The Grand Jury further alleges that:

1.   On or about February 9, 2003, in Los Angeles County, within the Central District of California, defendant WALLACE and others known and unknown, aiding and abetting one another, willfully, deliberately, with premeditation and malice aforethought, killed victim R.P., in violation of California Penal Code Sections 31, 187, 188, and 189.

2.   On or about November 13, 2014, in Los Angeles County, within the Central District of California, defendant WALLACE and others known and unknown, aiding and abetting one another, willfully, deliberately, with premeditation and malice aforethought, killed victim R.B., in violation of California Penal Code Sections 31, 187, 188, and 189.

COUNT TWO

[18 U.S.C. §§ 924(c)(1)(A)(ii), (iii), (j)(i), 2(a)]

On or about November 13, 2014, in Los Angeles County, within the Central District of California, defendant PAUL GARY WALLACE, also known as "Doc," "Lil Doc," "Lil Doc Thone," "Bill," "Uncle Bill," and "Still Bill," and others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly used, carried, brandished, and discharged a firearm, namely, a Norinco AKM-47S 7.62 caliber assault rifle, bearing serial number M001856, during and in relation to, and possessed that firearm in furtherance of, a crime of violence for which he may be prosecuted in a court of the United States, namely, murder in aid of racketeering activity, in violation of Title 18, United States Code, Section 1959(a)(1).

In the course of discharging this firearm, and through the use of this firearm, defendant WALLACE, and others known and unknown to the Grand Jury, each aiding and abetting the other, caused the death of R.B., a death that constituted a murder, as defined in Title 18, United States Code, Section 1111(a).

## NOTICE OF SPECIAL FINDINGS

The allegations of Counts One and Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

As to Count Two, defendant PAUL GARY WALLACE:

1.  Was 18 years of age or older at the time of the offense (18 U.S.C. § 3591(a));

2.  Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant of the offense, and R.B. died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

//

//

1     3.    Defendant WALLACE in the commission of the offense

2 knowingly created a grave risk of death to one or more persons in

3 addition to the victim of the offense, namely, to R.B. (18 U.S.C.

4 § 3592(c)(5)).

A TRUE BILL

/S/
_____
Foreperson

NICOLA T. HANNA
United States Attorney

*Brandon Fox*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

JOANNA M. CURTIS
Assistant United States Attorney
Chief, Violent & Organized Crime
Section

JEFFREY M. CHEMERINSKY
JOSEPH D. AXELRAD
Assistant United States Attorneys
Violent & Organized Crime Section